## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MIGUEL RODRIGUEZ,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 12 C 9050** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### MEMORANDUM OPINION AND ORDER

Miguel Rodriguez ("Petitioner") is serving a life sentence for participating in racketeering and narcotics conspiracies. In November 2012, he moved to vacate his conviction under 28 U.S.C. § 2255 ("the Petition"). (R. 1, Pet.) This Court denied the Petition. (R. 4, Min. Entry.) Petitioner appealed. (R. 7, Notice of Appeal.) Thereafter, the U.S. Court of Appeals for the Seventh Circuit remanded so that this Court could fully articulate the reasons underlying its decision. (R. 18, Order.) Those reasons are set forth below.

### BACKGROUND

The facts relating to Petitioner's conviction are set forth in three opinions by the Seventh Circuit, *see United States v. Morales*, 655 F.3d 608 (7th Cir. 2011); *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011); *United States v. Benabe*, 436 Fed. App'x 639 (7th Cir. Aug. 18, 2011) (per curiam), and several orders of this Court, *see United States v. Delatorre*, 572 F. Supp. 2d 967 (N.D. Ill. 2008); *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007); *United States v. Delatorre*, 508 F. Supp. 2d 648 (N.D. Ill. 2007); *United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006). The facts are repeated here only as they pertain to the Petition.

In 2002, state and federal authorities began an intensive investigation into the Insane Deuces street gang after one of its members, Orlando Rivera, agreed to serve as a confidential informant. *Morales*, 655 F.3d at 615. Petitioner was among sixteen men indicted on various racketeering-related charges in connection with the investigation. *Id.* The evidence adduced at trial showed that the Insane Deuce Nation (also referred to as the "Insane Deuces," "Deuces," or the "Nation") was an organized street gang affiliated with the Folks, a national network of local gangs. *Id.* The gang was predominantly made up of Latino/Hispanic males and operated primarily within northern Illinois, though other factions existed throughout Illinois and various state and federal prisons. *Id.* The government's investigation focused on the Aurora Deuces, a chapter with a significant presence in Aurora, Illinois. *Id.* As of 2002, the Aurora Deuces had become bitter rivals of the Latin Kings (also referred to as the "Kings"). *Id.* at 616. This rivalry resulted in "frequent and escalating violence," and often resulted in attacks on innocent persons who were mistakenly believed to be rival gang members. *Id.*

The Insane Deuces had its own set of "leyas," or laws, as well as a detailed hierarchy. *Id.* There were three tiers of membership within the gang: Seniors, Juniors, and Shorties. *Id.* Shorties were the gang's youngest members, and they held the responsibility of carrying out most of the gang's activities, including shootings and other acts of violence, as well as selling drugs to fund the gang. *Id.* The Shorties were often juveniles who were recruited to increase the gang's ranks. *Id.* By participating in gang activities, Shorties could work their way up to becoming Juniors, who were responsible for the gang's day-to-day operations. *Id.* Juniors directed Shorties in their activities, including determining who would participate in particular acts of violence, distributing firearms, and otherwise supervising the Shorties' activities. *Id.* The Seniors were "longstanding members of the gang whose age and accomplishments made

them the leaders, broad-scope planners, and advisors for the gang." *Id.* Seniors directed the

Juniors on larger issues, but they were more removed from the gang's day-to-day activities. *Id.*

The gang's daily activities included selling drugs to benefit the gang, carrying out

"missions" (attacks on rival gang members), protecting and supporting fellow gang members and

their families, punishing gang members who violated the gang's rules, and conducting meetings

to further these goals. *Id.* The gang also maintained a "caja" system, which was "a loose form

of community property and money acquired for the benefit of gang members." *Id.* For instance,

if a gang member was arrested, other members of the gang could take money from the caja to

bail him out of jail. *Id.* The caja also included a stash of drugs from which a gang member

could borrow to make sales or trades for the benefit of the gang. *Id.* Gang members were also

permitted to sell drugs from outside sources, but all sales needed to benefit the gang in some

way, usually by paying part of the proceeds into the caja. *Id.* Profits from drug sales were also

used to purchase firearms for the gang. *Id.* These guns were used to conduct missions and to

protect fellow gang members, and were usually returned to the caja after the mission was

completed, unless they were disposed of to avoid ballistics evidence after a murder was

committed. *Id.*

Participation in the gang was mandatory for Juniors and Shorties; this included gang

members who were "rolled back" from Senior to Junior status in 2002 as part of an effort to

better train and lead the gang's growing number of Shorties. *Id.* Every Junior and Shorty

member had to pay dues to the caja. *Id.* Missions were assigned to specific gang members,

usually Shorties, and primarily consisted of attacks on rival gang members in retaliation for acts

of violence or perceived encroachment on the gang's territory. *Id.* at 616-17. Guns were

distributed for these missions, and members were directed to empty the entire magazine or suffer

punishment for every bullet not fired. *Id.* at 617. In addition to these planned attacks, all members of the gang were required to comply with a "standing order" to attack Latin Kings whenever they had the opportunity to do so. *Id.* Members worked their way up through the gang by participating in missions and other acts of violence, and by donating money or firearms to the caja through drug sales or theft. *Id.* In exchange for their participation, gang members and their families received financial support and physical protection; these benefits applied to gang members on the street as well as gang members incarcerated in correctional facilities. *Id.*

Working with authorities, Rivera surreptitiously recorded several meetings and conversations between Insane Deuces, reported on the gang's activities and plans, and conducted controlled buys of narcotics and firearms from gang members. *Id.* The intelligence gathered through Rivera produced evidence regarding "four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution incidents—all of which the Deuces perpetrated in 2002 alone." *Id.* In exchange for his cooperation, Rivera was given full immunity and received monetary compensation. *Id.* From information obtained through Rivera, government authorities learned about each of the defendants' roles in the gang. *Id.* Petitioner worked his way up through the gang over the course of more than a decade to become a Senior member; in 2002 he was rolled back to Junior status along with several other Seniors. *Id.* The Seventh Circuit summarized Petitioner's involvement in the gang as follows:

> Coming up in the Deuces, he attempted to kill rivals and distributed drugs for the gang's benefit. He had assisted in developing the leyas and assigned missions to Shorties. After being rolled back, he advocated murdering members of the rival Ambrose street gang en masse and murdering whoever had been cooperating with the police from within the Deuces.

*Id.* at 617-18.

4

In 2006, a federal grand jury indicted Petitioner and fifteen other Insane Deuces on charges of racketeering conspiracy; assault with a dangerous weapon, murder, attempted murder, and conspiracy to commit murder in aid of racketeering activities; illegal possession of firearms; distribution and possession of narcotics; and conspiracy to distribute narcotics. *Id.* at 618. One of the sixteen pled guilty, and another remained a fugitive. *Id.* Given the logistical challenges of trying the remaining fourteen defendants in a single courtroom, this Court severed the case into two trials. *Id.* Petitioner was grouped with the second group, the "less major players," which was to be tried before U.S. District Judge Harry D. Leinenweber. *Id.*

In April 2008, Judge Leinenweber commenced the trial of the second group. *United States v. Morales*, No. 03 CR 90, 2009 WL 1456567, at *1 (N.D. Ill. May 22, 2009). A mistrial was declared shortly after opening statements were made, however, when several jurors asked to be removed from the jury. *Id.* In October 2008, a retrial was held. *Morales*, 655 F.3d at 619. On the government's motion, Judge Leinenweber empaneled an anonymous jury. *Id.* The trial spanned three months, during which time the government presented extensive witness testimony, recordings of gang meetings, and forensic evidence establishing the gang's activities, rules, and purpose. *Id.* The government's key witness, Rivera, described the inner workings of the gang, explained what was said in the various recorded meetings, and described the gang's organization and means of rule enforcement. *Id.* Two other former gang members, Lorenzo Becerra and Akeem Horton, also testified regarding the gang's activities and the scope of participation of each individual defendant. *Id.* The government also presented testimony from a variety of police officers and federal agents, as well as several victims of the violence perpetrated by the gang. *Id.*

After a week of deliberations, the jury returned its verdicts finding all but one of the defendants guilty of racketeering conspiracy.[1]  *Id.*  It also found Petitioner and others guilty of distribution of narcotics.  *Id.*  A second phase of the trial was then conducted, wherein the jury returned special verdicts as to each defendant; "the special verdicts were highly individualized, differentiating between the defendants on shared counts."  *Id.*  For his role in the conspiracy, Petitioner was sentenced to life in prison.  *Id.* at 620.

Thereafter, the defendants appealed.  *Id.*  They raised various joint and individual arguments in what the Seventh Circuit described as a "virtual cannonade of briefing exceeding 280 pages in total."  *Id.*  Jointly, the defendants argued that the Court erred in empanelling an anonymous jury, erred in denying their motions for severance, and erred in handling an allegation of juror misconduct that arose during the trial.  *Id.* at 620-26.  Petitioner separately argued that there was insufficient evidence to support his conviction on the narcotics conspiracy count.  *Id.* at 634.  He also raised two arguments related to his sentence: that the Court erred in holding him accountable for violent acts committed by other members of the gang; and that the Court erred in "double-counting" his conviction for possession of a firearm in calculating his criminal history category.  *Id.* at 637.  In a lengthy published opinion, the Seventh Circuit rejected each of these arguments and affirmed Petitioner's conviction and sentence.  *Id.* at 620-47.

In November 2012, Petitioner filed his Petition with this Court.  (R. 1, Pet.)  He argues that he received ineffective assistance from his trial counsel, Mark Kusatzky, on nine different grounds.  (R. 3, Pet'r's Mem. at 2-38.)  Specifically, he asserts that counsel: (1) failed to object

---

[1]  The jury could not reach a verdict as to defendant Steven Perez.  He was later retried before this Court and convicted on all charges.  *See United States v. Perez*, 673 F.3d 667, 668 (7th Cir. 2012).

to the statements of his co-defendants, which he claims were admitted in violation of *Bruton v. United States*, 391 U.S. 123 (1968); (2) failed to present written objections to the Pre-Sentence Report ("PSR"); (3) failed to challenge the sufficiency of the indictment; (4) failed to negotiate a plea offer on his behalf; (5) failed to adopt a "withdrawal" defense; (6) failed to raise a speedy trial argument; (7) failed to challenge his life sentence; (8) failed to object to "perjured" testimony in which witnesses and the government's attorney mistakenly referred to him as "Miguel Martinez"; and (9) failed to object to Rivera's testimony given that he was financially compensated for his cooperation with the government. (*Id.* at 2-5.)

## LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner can seek to vacate his sentence on "the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. "[R]elief under 28 U.S.C. § 2255 is limited to an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Bischel v. United States*, 32 F.3d 259, 263 (7th Cir. 1994) (internal quotation marks and citation omitted).

## ANALYSIS

### I.     The Petition

All nine claims in the Petition center on ineffective assistance of trial counsel. (R. 1, Pet. at 4-5; R. 3, Pet'r's Mem. at 2-38.) Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not 'fall below an objective standard of reasonableness' in light of 'prevailing professional norms.'" *Bobby v. Van Hook*,

558 U.S. 4, 16 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail

on such a claim, the petitioner must show: (1) counsel's performance was deficient; and (2) the

deficient performance prejudiced him. *Strickland*, 466 U.S. at 684-85. On the deficiency prong,

the central question is "whether an attorney's representation amounted to incompetence under

'prevailing professional norms,' not whether it deviated from best practices[.]" *Harrington v.*

*Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 690). In other words,

"counsel need not be perfect, indeed not even very good, to be constitutionally adequate."

*McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (citation omitted); *see also*

*Harrington*, 131 S. Ct. at 791 ("[T]here is no expectation that competent counsel will be a

flawless strategist or tactician."). On collateral review, the Court's review of counsel's

performance is highly deferential: "[T]he question is not whether counsel's actions were

reasonable. The question is whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. In considering that question,

the Court must avoid employing the benefit of hindsight, and must respect its "limited role in

determining whether there was manifest deficiency in light of information then available to

counsel." *Premo v. Moore*, 131 S. Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must establish a reasonable probability that, "but

for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. A reasonable probability is one that is "sufficient to undermine

confidence in the outcome." *Id.* In assessing prejudice under *Strickland*, "the question is not

whether the Court can be certain counsel's performance had no effect on the outcome or whether

it is possible a reasonable doubt might have been established if counsel acted differently."

*Harrington*, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just

8

conceivable." *Id.* at 792. Where the petitioner wanted counsel to raise an argument that had no merit, an ineffective assistance claim cannot succeed: "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

Additionally, in assessing counsel's performance, the Court must "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). As the Seventh Circuit has instructed, "[I]t is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) (citation omitted).

### A.    Failure to Object to Co-Defendants' Statements

Petitioner first argues that counsel was ineffective in failing to object to the admission of statements by his co-defendants, including post-arrest statements by Mariano Morales and Fernando Delatorre.[2]   (R. 3, Pet'r's Mem. at 12-15.)   He believes the admission of this evidence violated his rights under *Bruton*. (*Id.* at 14-15.)

---

[2]  In support of this argument, Petitioner submits an "Affidavit of Truth" from Delatorre dated August 2012. (R. 3, Pet'r's Mem., Ex. C, Delatorre Aff.)  The affidavit consists of one sentence in which Delatorre purports to "repudiate any & all statements, proffers, & grand jury testimony related to United States v. Delatorre Case No. 03-CR-90." (*Id.*)  The Court puts little stock in Delatorre's vague, eleventh-hour retraction.  Delatorre engaged in a campaign of obstructionist behavior throughout this case—including submitting various "affidavits of truth"—which ultimately led to his exclusion from the courtroom during trial.  *See Benabe*, 654 F.3d at 761-74. The Seventh Circuit found Delatorre's exclusion from the trial proper, concluding that he had conducted himself in "a manner so disorderly, disruptive, and disrespectful of the court that his trial [could not] be carried on with him in the courtroom." *Id.* at 770-71 (citing *Illinois v. Allen*, 397 U.S. 337, 343 (1970)).  In any event, a retraction by Delatorre several years *after* the trial is not relevant to whether Petitioner's counsel was deficient in light of the information known to him at the time of trial. *See Premo*, 131 S. Ct. at 741.

The Sixth Amendment Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Because of this right, "[i]f a co-defendant makes an out-of-court confession that inculpates the defendant, and the co-defendant does not testify at their joint trial, the out-of-court statement cannot be introduced as evidence at all; the risk of prejudice to the non-confessing defendant is simply too great, even with a limiting instruction." *United States. v. Volpendesto*, 746 F.3d 273, 290 (7th Cir. 2014) (citing *Bruton*, 391 U.S. at 123); *see also Gray v. Maryland*, 523 U.S. 185 (1998); *Richardson v. Marsh*, 481 U.S. 200 (1987). However, "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." *Bruton*, 391 U.S. at 136. For instance, there is no *Bruton* problem if a proper limiting instruction is provided and "the confession is redacted to eliminate not only the [defendant]'s name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211.

In this case, the Court considered potential *Bruton* problems before trial in the context of the defendants' motions to sever. *See United States v. Delatorre*, 522 F. Supp. 2d 1034, 1047 (N.D. Ill. 2007). The defendants argued that they should be tried separately because the use of a co-defendant's statement at a joint trial "may inculpate them in violation of *Bruton*[.]" *Id.* This Court recognized that under *Bruton*, "[c]o-defendants' confessions may be admitted . . . if they are sufficiently redacted so they do not facially incriminate or obviously refer to other defendants." *Id.* The Court noted that in *United States v. Hernandez*, 330 F.3d 964, 974 (7th Cir. 2003), the Seventh Circuit concluded that a reference in a defendant's post-arrest interview to the "Latin Kings" did not implicate the co-defendants, because those terms could have referred to "any number of other" Latin Kings. *Id.*; *see also United States v. Green*, 648 F.3d

569, 573 (7th Cir. 2011) ("A *Bruton* violation may be avoided . . . by redacting the reference to the defendant and substituting a generic reference such as 'another person' or 'another member of the group.'"). This Court reviewed the statements sought to be used by the government, along with the government's proposed redactions, and found no danger of a *Bruton* violation. *Delatorre*, 522 F. Supp. 2d at 1047. Portions of the statements, along with the redactions, were later entered into evidence at trial. Consistent with *Hernandez*, the government redacted reference to any defendant present in the courtroom, and instead referred to them generally as "gang members." (*See United States v. Delatorre, et al.*, No. 03 CR 90, Trial Tr. at 3672.) Several defense attorneys—including Petitioner's—advocated for broader redactions, but their objections were rejected by Judge Leinenweber. (*Id.* at 3672-3706.) The Judge nevertheless provided limiting instructions to the jury regarding the consideration of this evidence. (*Id.* at 3699, 4833, 4838.)

Petitioner does not point to any specific deficiency in the arguments raised by his counsel, or to any error in the Court's analysis of this issue. Instead, he appears to believe no one ever raised the issue, which is incorrect. He also appears to misunderstand the scope of *Bruton*, which would not bar the admission of statements of any Insane Deuces who were not tried with him. *See Volpendesto*, 746 F.3d at 290 (describing *Bruton* problem as arising during a "joint trial" of defendant and co-defendant who confessed); *United States v. Moore*, 521 F.3d 681, 683 (7th Cir. 2008) (noting that defendant was tried separately from confessing co-defendant "to avoid *Bruton* problems"). Nor would *Bruton* preclude the admission of statements that were independently admissible against Petitioner under the Federal Rules of Evidence. *See* Fed. R. Evid. 801(d)(2)(E) (providing hearsay exception for "statements made by the party's coconspirator during and in furtherance of the conspiracy"); *United States v. Williams*, 858 F.2d

1218, 1224 (7th Cir. 1988) ("The Court in *Bruton* . . . dealt with a confession that clearly was inadmissible hearsay as to the nonconfessing defendant and does not control where, as here, the codefendant's statements complained of clearly are admissible as statements made by a co-conspirator in furtherance of a conspiracy."). Petitioner's counsel challenged the admissibility of the co-conspirator statements prior to trial in response to the government's *Santiago* proffer.[3] (*See Delatorre*, R. 620.) The Court nevertheless permitted the bulk of these statements to be admitted into evidence. (*Id.*, R. 637, Min. Entry & R. 638, Min. Entry.) Therefore, the record belies Petitioner's argument that counsel ignored this issue.

In addition, in determining whether Petitioner's counsel was ineffective, the Court must consider his performance as a whole during this complex and difficult case. *See Sussman*, 636 F.3d at 351. The record reflects that counsel advocated vigorously on Petitioner's behalf throughout the lengthy proceedings. He filed multiple motions and other documents, including: a motion for discovery, (*Delatorre*, R. 199); a motion to sever the trial, (R. 342); motions to adopt various arguments raised by Petitioner's co-defendants, (R. 491, 535); a response to the government's *Santiago* proffer, (R. 620); a motion for a bench trial, (R. 802); motions in limine, including a motion to exclude the government's ballistic expert, (R. 622, 624, 875, 1051); a motion seeking Petitioner's release on bond following the mistrial, (R. 1002); proposed jury instructions and a supporting brief, (R. 1117, 1118); a post-trial motion for a hearing on the issue of alleged juror misconduct, (R. 1210); a motion for a new trial and/or judgment of acquittal, (R.

---

[3] A district court is permitted to decide prior to trial whether to admit co-conspirator testimony, based on a proffer from the government that it has sufficient evidence to prove the existence of a conspiracy. *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987). "This procedure helps streamline trials by permitting the government to introduce co-conspirator testimony at any point during the trial rather than waiting until after it has provided sufficient independent proof of conspiracy." *United States v. Bey*, 725 F.3d 643, 647 (7th Cir. 2013).

1325); objections to the PSR, (R. 1624); a sentencing memorandum, (R. 1630); a supplemental

motion for a new trial, (R. 1632); and a timely notice of appeal, (R. 1648).

The trial transcript also reflects that Petitioner's counsel was attentive and conscientious

in protecting Petitioner's interests during the lengthy trial. He raised countless objections, (*see,*

*e.g.,* Trial Tr. at 290, 469, 473, 526, 528, 708-09, 712, 723, 986, 1282, 1615, 1634-35, 1641,

1645, 3583-88, 4343); argued a motion in limine, (*id.* at 8-9); participated in jury selection, (*id.*

at 67, 326, 331-32, 337); gave an opening statement, (*id.* at 68-73); cross-examined the

government's witnesses, including conducting an extensive cross-examination of the

government's key witness, Rivera, (*id.* at 295-97, 322, 388-90, 1333-1412, 1674-78, 2765-67,

3301-03, 3330-37, 3339-40, 3663-64, 3817, 3834); raised a concern with the Court regarding

media coverage of the trial, (*id.* at 749); renewed his motion for a severance, (*id.* at 1082);

requested various limiting instructions, (*id.* at 3230, 3309, 3631, 4911); presented a witness and

documentary evidence on Petitioner's behalf, (*id.* at 3860-4112); participated in the jury

instruction conference, (*id.* at 4164, 4173, 4176); made recommendations regarding the drug

quantity findings being submitted to the jury, (*id.* at 4196); made a lengthy closing argument, (*id.*

at 4398-4428); corrected another defense attorney when he mistakenly referred to someone as

"Rodriguez" during his closing argument, (*id.* at 4583); objected during the government's

closing arguments, (*id.* at 4728, 4760, 4761, 4764); voiced his views regarding a note received

from the jury, (*id.* at 4937-48); argued to the jury at the special verdict phase, (*id.* at 5043-47);

requested that the jury notes be preserved for purposes of post-trial motions and appeals, (*id.* at

5138); and argued on Petitioner's behalf at sentencing, (Sentencing Tr. at 2-63).

Based on the record, the Court cannot conclude that Petitioner's counsel was ineffective in failing to challenge the admission of his co-defendants' statements. Accordingly, the Court finds no merit to ground one.

## B.    Failure to Present Written Objections to the PSR

Petitioner next argues that counsel was ineffective in failing to present written objections to the PSR. (R. 3, Pet'r's Mem. at 2, 15-18.) This argument is somewhat perplexing because, as noted above, Petitioner's counsel did in fact file written objections to the PSR, (*Delatorre*, R. 1624), as well as a sentencing memorandum, (R. 1630). In these filings, counsel argued that Petitioner's conduct did not warrant a life sentence; he pointed out that Petitioner was not personally implicated in any of the acts of violence described at trial, and also highlighted that Petitioner had worked, paid his taxes, and attended school during the dates of the conspiracy. (R. 1624 at 2-13; R. 1630 at 4-7.) Counsel also argued that there was a lack of evidence regarding Petitioner's participation in the gang during various time periods alleged in the indictment. (R. 1624 at 3-4; R. 1630 at 6.) At the sentencing hearing, counsel argued that Petitioner should not be held liable for the entire scope of the criminal enterprise, and that a life sentence was inappropriate in light of all the relevant considerations. (Sentencing Tr. at 2-63.) Judge Leinenweber rejected these arguments and sentenced Petitioner to life in prison, but noted that counsel had been an "eloquent" advocate on Petitioner's behalf. (*Id.* at 58.) Petitioner challenged various aspects of his life sentence on direct appeal, but the Seventh Circuit affirmed the imposition of the sentence that was imposed. *Morales*, 655 F.3d at 635-37.

Although unclear, Petitioner appears to fault counsel for not specifically arguing that the illegal acts of his co-defendants were unforeseeable to him. (R. 3, Pet'r's Mem. at 16-18.) Notably, other defendants raised this argument on direct appeal, and the Seventh Circuit rejected

the arguments in light of the extensive evidence of the racketeering enterprise and each individual defendant's participation in it. *Morales*, 655 F.3d at 638, 645-46. Indeed, such an argument by Petitioner would have bordered on frivolous, given that he could be heard on audio recordings advocating the murder of rival gang members and promoting the gang's drug-dealing system. *See id.* at 617-18, 635.

Based on the record, and considering the overall scope of counsel's representation, the Court concludes that counsel provided reasonably effective assistance at sentencing. The Court therefore finds no merit to ground two.

### C.   Failure to Challenge the Sufficiency of the Indictment

Petitioner next argues that counsel was ineffective in failing to challenge the sufficiency of the indictment. (R. 3, Pet'r's Mem. at 19-23.) Contrary to Petitioner's suggestion, the record reflects that counsel did raise this issue by joining in a pretrial motion to dismiss that was filed by one of Petitioner's co-defendants. (*Delatorre*, R. 533, Lechuga's Mot. to Dismiss; R. 535, Pet.'s Mot. to Join.) That motion was fully considered and denied by this Court. (R. 566, Min. Entry.) Petitioner does not point to any deficiency in the arguments contained in that motion, and instead appears unaware of its filing—and the Court's adverse ruling—when he asserts that "Counsel was ineffective for not challenging the sufficiency and the validity of the indictment [ ] pre-trial." (R. 3, Pet'r's Mem. at 20.)

In any event, the indictment in this case was legally sufficient. An indictment charging RICO offenses "need only charge—after identifying a proper enterprise and the defendant's association with that enterprise—that the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise through a pattern of racketeering activity." *United States v. Tello*, 687 F.3d 785, 794 (7th Cir. 2012). The indictment at issue here included facts about the

15

Insane Deuces, the type of street gang that has consistently been held to constitute a RICO enterprise. *See Morales*, 2009 WL 1456567, at *4. The indictment also included allegations of Petitioner's participation in the enterprise. (*Delatorre*, R. 227, Indictment at 7, 23, 32.) Accordingly, the indictment was legally sufficient.

Petitioner's argument appears to be based on a misunderstanding of the nature of the charges and the evidence needed to convict him. He suggests that there was no evidence showing that he personally participated in the violent acts outlined at trial, or that he personally sold drugs on any specific occasions. (R. 3, Pet'r's Mem. at 20-22.) However, as the Seventh Circuit explained in the context of Petitioner's sufficiency of the evidence argument challenging his narcotics conspiracy conviction, "[t]he government was not required to prove that [Petitioner] personally bought, sold, or possessed any narcotics in order to obtain a conviction[.]" *Morales*, 655 F.3d at 637. Instead, the government only needed to show that Petitioner "either implicitly or explicitly agreed" with other Deuces to distribute narcotics. *Id.* at 634. The same rule applied to the RICO conspiracy charge. *See Tello*, 687 F.3d at 792-93 (a RICO conspiracy charge requires proof that the defendant "agreed that some member(s) of the conspiracy would commit two or more predicate acts, not that the defendant himself committed or agreed to commit such acts").

As outlined by the Seventh Circuit, the evidence of Petitioner's participation in the gang was significant. Petitioner was a long time member with more than a decade of participation, during which time he took a leadership role when he "assisted in developing the leyas" and "assigned missions to Shorties." *Id.* at 617-18. The evidence established that he was well aware of the gang's free enterprise system, and that he had enjoyed the benefits of this system during his years of participation. *Morales*, 655 F.3d at 635. He was heard on audio tape advocating

violence against rival gang members and an Insane Deuce who was believed to be cooperating with police. *Id.* There was also evidence that he possessed and sold firearms to benefit the gang. *Morales*, 2009 WL 1456567, at *5. In short, there was more than sufficient proof that Petitioner joined and participated in the RICO and narcotics conspiracies.

In light of the record, and given the overall scope and quality of counsel's representation, the Court finds no basis to conclude that Petitioner's counsel was ineffective in failing to challenge the indictment. Accordingly, ground three is denied.

### D. Failure to Negotiate a Plea Offer

Petitioner next argues that counsel was ineffective because he failed to negotiate a plea offer on Petitioner's behalf. (R. 3, Pet'r's Mem. at 23-25.) The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). Such claims are governed by the same two-part test articulated in *Strickland*. *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012). On the performance prong, the defendant must show that counsel's representation in connection with the plea process fell below an objective standard of reasonableness. *Lafler*, 132 S. Ct. 1384 (quoting *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). To establish prejudice, the defendant must show that "the outcome of the plea process would have been different with competent advice." *Id.*

Here, Petitioner does not assert that counsel misadvised him in connection with a plea. Instead, Petitioner faults counsel for not trying to negotiate a plea on his behalf. (R. 3, Pet'r's Mem. at 23-25.) His reliance on *Frye* is misplaced, because that case involved the failure to communicate a plea offer that was actually made by the government. *See Frye*, 132 S. Ct. 1405. In addition, Petitioner readily acknowledges that he had no interest in cooperating with the government; he communicated this fact to counsel when he asked counsel about the possibility

of obtaining a plea.[4] (R. 3, Pet'r's Mem. at 23.) Counsel told him he could not negotiate a plea agreement unless Petitioner was willing to provide some form of cooperation to the government. (*Id.* at 24.) Petitioner submits nothing to suggest that this advice was inaccurate. Indeed, the record reflects that Horton, the only defendant to plead guilty pursuant to a plea agreement, testified as a witness for the government at trial. *See Morales*, 655 F.3d at 619. To establish prejudice in connection with a claim of ineffective assistance at the plea bargain stage, Petitioner must demonstrate a reasonable probability that a plea would have been accepted by the government and approved by the court if not for counsel's deficient performance. *See Lafler*, 132 S. Ct. at 1385. Based on the record, he has failed to do so. The Court finds no merit to ground four.

### E.      Failure to Adopt a Withdrawal Defense

Petitioner next argues that counsel was ineffective in failing to adopt the same "withdrawal" defense presented by his co-defendant Lionel Lechuga. (R. 3, Pet'r's Mem. at 3, 25-28.) Counsel is given significant discretion in selecting a trial strategy based on his professional judgment. *See Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011) ("The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (citation omitted)); *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) (if counsel's decisions were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel," counsel's performance will not be considered deficient). "To reflect the wide range of competent legal strategies and to avoid

---

[4] Indeed, the record reflects that Petitioner remained uncooperative even after the guilty verdict. At sentencing, Judge Leinenweber noted that Petitioner did not express remorse or take any responsibility for his actions when given the opportunity to speak, and instead chose "to criticize the conduct of the government's investigation, conduct of the case, and conduct of [his] lawyer." (Sentencing Tr. at 58.)

the pitfalls of review in hindsight," the Court's review of counsel's selection of a trial strategy "is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (quoting *Yu Tian Li*, 648 F.3d at 527-28).

Based on the record, Petitioner has failed to overcome that presumption, primarily because Lechuga's withdrawal defense was ultimately unsuccessful. Lechuga's attorney presented evidence and argued at length that Lechuga had "retired" from the gang, but the jury nevertheless found Lechuga guilty of racketeering and narcotics conspiracy. *See Morales,* 2009 WL 1456567, at *6-*8. Lechuga re-asserted his withdrawal argument on appeal, but the Seventh Circuit found it lacking:

> Even if Lechuga was "retired" and not a Senior, neither retirement from an organization nor mere inactivity constitutes effective withdrawal from a conspiracy. *United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007). Effective withdrawal requires the conspirator to take an affirmative act, either confessing to authorities or clearly communicating to his co-conspirators that he disavows the conspiracy and its criminal objectives. *United States v. Emerson*, 501 F.3d 804, 811 (7th Cir.2007). In his own words, Lechuga remained willing to help the gang in its endeavors during the period of his supposed withdrawal; he never voiced his disassociation from the gang, and he certainly did not cooperate with authorities to disrupt its criminal activities.

*Morales*, 655 F.3d at 640-41.

These same considerations would have doomed a withdrawal defense raised by Petitioner. Indeed, such an argument by Petitioner would have been even less compelling than Lechuga's. Lechuga's argument was based in part on the fact that he said little during the two recorded gang meetings at which he was present, other than to complain about the roll-back of the Seniors. *See Morales*, 2009 WL 1456567, at *7. In contrast, Petitioner can be heard on various audio recordings after the roll-back identifying himself as a member of the gang, discussing making decisions as a leader of the gang, and advocating acts of violence—including

19

"murdering members of the rival Ambrose street gang en masse and murdering whoever had been cooperating with the police from within the Deuces." *Morales*, 655 F.3d at 617-18. Under these circumstances, the Court cannot conclude that counsel was ineffective in failing to pursue an argument that Petitioner had withdrawn from the gang.

Within this claim, Petitioner also complains that his attorney was "playing video games" and looking at his phone at various points during the trial. (R. 3, Pet'r's Mem. at 27-28.) Petitioner made this assertion for the first time at his sentencing hearing, which occurred nearly 10 months after the trial was over. (Sentencing Tr. at 3-4.) As Judge Leinenweber noted, if Petitioner had concerns about his attorney during the trial, he should have raised them at the time of trial. (*Id.* at 4.) The record reflects that Petitioner was aware of how to raise an issue with the Court if he felt it necessary, as he filed numerous *pro se* documents during the case, including sending the Court a letter prior to trial complaining that his attorney had not come to visit him. (*See Delatorre*, R. 480, 899, 916, 990.) In addition, as outlined above, the transcript belies an argument that Petitioner's counsel was merely playing games and otherwise ignoring his duties during the trial. Instead, it reflects that counsel was paying close attention to the proceedings and taking the steps necessary to protect Petitioner's interests. Based on the record, the Court finds no merit to ground five.

## F.     Failure to Raise a Speedy Trial Claim

Petitioner next argues that counsel was ineffective in failing to seek dismissal of the indictment based on a violation of his speedy trial rights. (R. 3, Pet'r's Mem. at 3-4, 28-30.) The speedy trial issue was raised by one of Petitioner's co-defendants, Delatorre, and was fully addressed by this Court prior to trial. *See United States v. Delatorre*, No. 03 CR 90, 2008 WL 343012 (N.D. Ill. Feb. 4, 2008).

The Speedy Trial Act codifies a defendant's Sixth Amendment right to a speedy trial. 18 U.S.C. § 3161; *United States v. Larson*, 417 F.3d 741, 746 (7th Cir. 2005). Under the Act, "a defendant must go to trial within 70 days of either the date of the issuance of an indictment or a defendant's first appearance before a judicial officer, whichever is later." *Blake v. United States*, 723 F.3d 870, 884 (7th Cir. 2013) (citing 18 U.S.C. § 3161(c)(1)). If a defendant is not brought to trial within that period, the indictment must be dismissed, either with or without prejudice. *Id.* The Act contains a number of provisions for excluding time from the 70-day clock, which "reflect Congress's understanding that a certain amount of scheduling flexibility is required by the courts in order to properly, fairly, and efficiently conduct and complete pretrial preparations." *Id.* This includes, among other things, time spent resolving pretrial motions, delays caused by the complexity of a case, delays attributable to the number of defendants, and continuances granted by the Court which serve the "ends of justice." *See* 18 U.S.C. § 3161(h)(1)-(8).

In this case, Petitioner was indicted in September 2005 and arraigned in October 2005. (R. 42, Min. Entry; R. 113, Min. Entry). As outlined in the order addressing Delatorre's speedy trial motion, time was excluded from November 2004 until the end of January 2008, primarily for the resolution of pretrial motions. *See Delatorre*, 2008 WL 343012, at *1. Between those dates, the defendants collectively filed in excess of 50 pretrial motions. *Id.* The Court issued nearly 20 substantive orders and held three evidentiary hearings addressing pretrial matters. *Id.*

The Court also excluded time during the first two years of this case while the government considered whether to seek the death penalty against several of the defendants. *Id.* at *2. The Court concluded that the ends of justice were served by allowing Defendants time to present mitigating evidence to dissuade the Department of Justice from seeking the death penalty. *Id.* Throughout the nearly two years it took to resolve the death penalty issue, this Court repeatedly

expressed its intention to provide the defendants with all of the resources and time they needed to adequately present their arguments. *Id.* Indeed, the government ultimately declined to pursue the death penalty against any of the defendants in this case. *Id.*

The large number of defendants also contributed to the Court's decision to exclude time during various periods. *Id.* The Court excluded time for delays attributable to joining each new defendant to the case, and the last defendant was not arrested until April 2007. *Id.* As each defendant was arrested and arraigned, the Court had a duty to exclude time to avoid unreasonably denying a defendant time to obtain counsel and effectively prepare for trial. *Id.* "It is well established . . . that the excludable delay of one defendant may be ascribed to all codefendants in the same case, absent severance." *Id.* (quoting *United States v. Parker*, 508 F.3d 434, 438 (7th Cir. 2007)). The Court also excluded time while a psychological examination of Delatorre was conducted. *Id.* In light of these considerations, the Court rejected the speedy trial argument raised by Petitioner's co-defendant.[5] *Id.*

The Court alternatively held that even if a speedy trial violation occurred, dismissal of the indictment with prejudice was inappropriate. *Id.* at *3. In determining whether to dismiss a case with prejudice, the Speedy Trial Act requires the Court to consider: "(1) the seriousness of the offense, (2) the facts and circumstances which led to the dismissal, and (3) the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice." *United States v. Killingsworth*, 507 F.3d 1087, 1090 (7th Cir. 2007) (citing 18 U.S.C.

---

[5] Time was excluded following the date of Delatorre's motion through and including October 2008, when Petitioner's retrial began, based on (among other considerations) the complexity of the case, the pendency of pretrial motions, and the ends of justice. (*See Delatorre*, R. 747, Min. Entry; R. 770, Min. Entry; R. 892, Min. Entry; R. 906, Min. Entry; R. 1028, Min. Entry.) The Court notes that the mistrial in April 2008 would have reset the 70-day clock. 18 U.S.C. § 3161(e) ("If the defendant is to be tried again following a declaration by the trial judge of a mistrial. . . the trial shall commence within seventy days from the date the action occasioning the retrial becomes final.").

§ 3162(a)(2)).  This Court concluded that all three factors weighed against dismissing the indictment with prejudice, particularly the seriousness of the offenses, which included murders and attempted murders committed in furtherance of the RICO conspiracy. *Delatorre*, 2008 WL 343012, at *3.

Petitioner suggests that his attorney was ineffective in failing to raise a speedy trial argument on his behalf.  (R. 3, Pet'r's Mem. at 28-30.)  He does not point to any errors in the Court's analysis of his co-defendant's identical argument, and instead appears unaware that the issue was thoroughly considered and rejected by the Court prior to trial.  The same factors would have governed the Court's analysis—and rejection—of a speedy trial argument raised by Petitioner.  In fact, such an argument from Petitioner would have been even less compelling than Delatorre's, because Petitioner was arraigned a year *after* Delatorre.  (*See Delatorre*, R. 15, Min. Entry & R. 113, Min. Entry.)  Based on the record, and in light of counsel's overall representation, the Court cannot conclude that counsel was ineffective on this ground. Accordingly, ground six is denied.

### G.     Failure to Challenge Petitioner's Life Sentence

Petitioner next argues that counsel was ineffective in failing to challenge his life sentence.  (R. 3, Pet'r's Mem. at 31-32.)  This argument appears to be merely a reformulation of ground two, in which Petitioner claimed that his counsel failed to raise objections to the PSR. As noted above, Petitioner's counsel argued at sentencing (both in writing and orally) that Petitioner did not deserve a life sentence.  (*See Delatorre*, R. 1624, 1630; Sentencing Tr. at 8-63.)  Judge Leinenweber disagreed, and the sentence that he imposed was affirmed by the Seventh Circuit. *Morales*, 655 F.3d at 635-37.

To the extent Petitioner is trying to argue that there was insufficient evidence to establish that he personally committed the murders charged in the indictment, as outlined above in connection with ground three, the government was not required to prove that Petitioner personally committed any murders. *See Tello*, 687 F.3d at 792-93. Based on the record, and considering the entire scope of counsel's representation, the Court declines to find that counsel was ineffective on this ground. Therefore, ground seven is denied.

## H. Failure to Object to "Perjured" Testimony

Petitioner next argues that counsel was ineffective in failing to object to "perjured" testimony, in which the prosecutor and certain witnesses mistakenly referred to him as "Miguel Martinez."[6] (R. 3, Pet'r's Mem. at 33-36.) The Seventh Circuit considered this issue on direct appeal in the context of Petitioner's argument that he was entitled to a severance, and found no evidence of any intentional wrongdoing or undue prejudice to Petitioner. *Morales*, 655 F.3d at 628. Miguel Martinez was another indicted Insane Deuce who remained a fugitive during the trial. *Id.* at n.4. The Seventh Circuit noted that there were five instances during the three-month trial where individuals mistakenly referred to Petitioner (Miguel Rodriguez) as Miguel Martinez: "[O]ne was immediately corrected by the witness, and another was promptly corrected on Petitioner's counsel's objection." *Id.* While the remaining three instances apparently went unnoticed, the Seventh Circuit found "no indication that these understandable and fleeting misnomers were intentional," or that Petitioner was prejudiced by them. *Id.* The court found it

---

[6] It appears Petitioner may be attempting to assert this ground and/or ground nine as a free-standing prosecutorial misconduct claim. (*See* R. 3, Pet'r's Mem. at 33, 36.) If so, such claims would be procedurally barred, because they could have been raised on direct appeal. *Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009) ("claims cannot be raised for the first time in a § 2255 motion if they could have been raised at trial or on direct appeal"). By contrast, ineffective-assistance claims are not subject to this rule. *See Massaro v. United States*, 538 U.S. 500 (2003) (federal prisoner need not raise a claim of ineffective-assistance on direct appeal, and instead may raise the claim for the first time in a collateral proceeding under 28 U.S.C. § 2255).

highly unlikely that "the jury could have confused [Petitioner] with a fugitive who was not before the court." *Id.* In light of the record, Petitioner has failed to establish deficient performance or prejudice in connection with this claim. Therefore, the Court finds no merit to ground eight.

## I.     Failure to Object to Rivera's Testimony

Finally, Petitioner argues that counsel should have moved to suppress Rivera's testimony in its entirety because Rivera was financially compensated for his cooperation with the government. (R. 3, Pet'r's Mem. at 36-37.) In Petitioner's view, the government's payment of compensation to Rivera constituted "bribery" of a witness under 18 U.S.C. § 201. (*Id.*) This argument has no merit. The government's grant of immunity or offer of monetary inducements to informants is permissible as long as the inducements are disclosed to the jury and are not contingent upon subsequent indictments or convictions. *United States v. Hendrix*, 482 F.3d 962, 968-69 (7th Cir. 2007); *United States v. Dawson*, 425 F.3d 389, 395, 395-98 (7th Cir. 2005). In this case, the issue of financial inducements and the immunity Rivera received were made crystal clear to the jury. Rivera testified for several days, and during his direct examination, he testified about his prior involvement in the Insane Deuces, his cooperation with the government, and his deal for immunity, including his understanding that the immunity was not contingent on a specific outcome of the trial. (Trial Tr. at 393-94.) Rivera acknowledged that after agreeing to cooperate, he was relocated and reimbursed by the government for his living expenses, food, and missed work. (*Id.* at 1007, 1028.) Defense counsel thoroughly cross-examined Rivera regarding his motives for testifying, his prior offenses, his inconsistent statements, and the details of his agreement with the government. (*Id.* at 1012-1687). During re-direct examination, Rivera testified even more extensively about the monetary compensation he received from the

government for his time as an informant. (*Id.* at 1637-1642.) Judge Leinenweber also instructed the jury that they must decide whether each witness's testimony was "truthful and accurate, in part, in whole, or not at all, as well as what weight, if any" the testimony should receive. (Trial Tr. at 4828.) The jury was also instructed that they could consider multiple factors in evaluating the credibility of a witness's testimony, including the witness's memory and any interest, bias, or prejudice the witness had, including whether he or she received monetary compensation or was granted immunity. (*Id.* at 4834-36.)

In other words, the jury was made well aware of the issues impacting Rivera's credibility, including the fact that he received compensation from the government. There is nothing in the record to suggest that Rivera's agreement with the government was contingent upon subsequent indictments or convictions. Based on the record, the Court concludes that counsel was not ineffective in failing to move to exclude Rivera's testimony under the federal bribery statute.

## II. Motion to Supplement the Petition

After this case was remanded by the Seventh Circuit, Petitioner filed two motions seeking to add entirely new claims to his Petition.[7] (R. 19, Mot. to Add; R. 20, Mot. to Supplement.) His filings are not a model of clarity, but as best as can be discerned he seeks to raise the following new claims: (1) his sentence was improperly enhanced in violation of the Supreme Court's recent opinion in *Alleyne v. United States*, 133 S. Ct. 2151 (2013); (2) the special verdict phase of the trial violated the Double Jeopardy Clause of the Fifth Amendment; and (3) his appellate counsel was ineffective in failing to properly raise the issue of juror misconduct on direct appeal. (R. 20, Mot. to Supplement at 2-35.)

---

[7] The initial motion, filed in October 2013, was only two pages long and merely indicates Petitioner's desire to add new claims to his Petition. (R. 19, Mot. to Add.) The proposed new claims are actually detailed in the second motion, which was filed in May 2014. (R. 20, Mot. to Supplement.)

As a preliminary matter, it does not appear that the Court has jurisdiction to entertain this motion, or to otherwise expand the grounds on which Petitioner is seeking federal habeas relief. This case was remanded solely for the Court to articulate its reasons for denying the original Petition. (R. 18, Order.) The Court is not permitted to venture beyond the scope of the Seventh Circuit's remand. *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) (on remand, district court must confine its consideration to the issues that were remanded); *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995) ("The mandate rule requires a lower court to adhere to the commands of a higher court on remand.").

Assuming there is jurisdiction, the Court would not permit the amendment in any event. Petitioner's conviction was affirmed by the Seventh Circuit in August 2011, and became final for purposes of Section 2255 in November 2011 after the time ran for him to seek review in the Supreme Court. *See Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when [the Supreme Court] affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). He had one year from that date to seek federal habeas relief. 28 U.S.C. § 2255(f)(1). Petitioner's original Petition—filed in November 2012—was timely filed within the limitations period. However, Petitioner could not raise entirely new claims in October 2013 or May 2014 (the dates he filed his motions to supplement), because these dates were well beyond the one-year deadline for seeking habeas relief. *See Mayle v. Felix*, 545 U.S. 644, 662-63 (2005) (once federal deadline has expired, petitioner cannot amend his petition to add new grounds for relief based on a different constitutional claim).

Under limited circumstances, an untimely amendment to a pleading may be deemed to "relate back" to an earlier, timely filed pleading. *See* Fed. R. Civ. P. 15; *Mayle*, 545 U.S. at 656-

27

57. The relation-back doctrine is narrowly applied in the habeas context in light of the strict deadlines imposed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *Mayle*, 545 U.S. at 662. To relate back, a new claim must be based on the same "common core of operative facts" as a claim raised in the timely filed petition. *Id.* at 664. It is not sufficient that the claims arise out of the same "trial, conviction, or sentence." *Id.* Upon review of Petitioner's proposed new claims, none of them can be said to relate back to those contained in his original Petition. Instead, they are based on entirely different operative facts and different legal principles. Accordingly, Petitioner cannot raise his new claims at this late stage.

Even if the claims were timely, they would fail for other reasons. As to his first claim, Petitioner argues that his sentence is unconstitutional under the Supreme Court's recent decision in *Alleyne*. (R. 20, Mot. to Supplement at 17-21, 30-34.) In *Alleyne*, the Supreme Court held that any fact that increases the mandatory minimum is an element of the crime that must be found beyond a reasonable doubt by the jury. *Alleyne*, 133 S. Ct. at 2160-63. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989). "Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review." *Whorton v. Bockting*, 549 U.S. 406, 416 (2007). As discussed above, Petitioner's conviction became final in 2011, and *Alleyne* was decided in 2013. Regardless of whether *Alleyne* would provide any assistance to Petitioner, it is inapplicable to his case. *See Simpson v. United States*, 721 F.3d 875, 876 (7th Cir. 2013) ("The [Supreme] Court resolved *Alleyne* on direct rather than collateral review. It did not declare that its new rule applies retroactively on collateral attack."); *United States v. Miller*,

28

542 Fed. App'x. 526, 528 (7th Cir. 2013) ("the Supreme Court has not made *Alleyne* retroactive to cases on collateral review"). Accordingly, the Court finds no merit to this potential claim.

Petitioner's second proposed claim, the alleged "Double Jeopardy" violation, could have been raised on direct appeal, but was not. As such, it would be procedurally barred in this proceeding. *See Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009) ("claims cannot be raised for the first time in a § 2255 motion if they could have been raised at trial or on direct appeal"). In addition, the claim has no merit. Petitioner appears to argue that the special verdict phase constituted a second "trial" that violated the prohibition on Double Jeopardy. (R. 20, Mot. to Supplement at 21-25.) The Double Jeopardy Clause precludes a second trial on the same charge following an acquittal. *Arizona v. Washington*, 434 U.S. 497, 505 (1978). However, Petitioner was not acquitted, nor was the special verdict phase a second "trial." Rather, it was a continuation of the trial intended to inform the Court's decision on the appropriate penalty for each defendant in accordance with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See Benabe*, 654 F.3d at 778. The Seventh Circuit expressly approved of the use of the special verdicts in this case, reasoning as follows:

> The district court exercised its discretion appropriately here by separating the jury's task into two phases. A verdict of guilty did not require a determination that a particular defendant participated in the full scope of the Insane Deuces racketeering conspiracy, with all of the murders, shootings, and drug deals. But once the jury found the defendants guilty of the RICO conspiracy, the maximum penalties they each faced depended on whether the involvement of each in the conspiracy included responsibility for murders or drug crimes serious enough to authorize a life sentence. . . . The district court's approach here was a sound way to address the problem of determining the maximum penalties for these defendants.

*Id.* at 777-78. Under these circumstances, Petitioner's proposed "Double Jeopardy" argument has no merit.

In his third proposed claim, Petitioner argues that he received ineffective assistance from his appellate counsel. (R. 20, Mot. to Supplement at 26-30.) He appears to claim that counsel failed to properly present her argument about juror misconduct. (*Id.*) The record reflects that Petitioner and his co-defendants jointly raised an argument regarding juror misconduct on direct appeal. *Morales*, 655 F.3d at 629-33. This argument was based on the fact that after the jury returned its verdicts in the first phase, Judge Leinenweber received a note from one of the jurors who stated that during the government's case-in-chief, some of the jurors had violated the Court's instructions not to discuss the case amongst themselves prior to deliberations. *Id.* After considering written submissions from all parties, Judge Leinenweber declined to hold a hearing on the issue and denied the defendants' request for a new trial on this ground. *Id.* The Seventh Circuit affirmed Judge Leinenweber's handling of this issue on appeal. *Id.* at 629-33.

Petitioner's argument is somewhat confusing, but he appears to argue that his counsel was ineffective in failing to cite to the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227 (1954), for the proposition that he was entitled to a hearing on the juror misconduct issue. (*See* R. 20, Mot. to Supplement at 27-28.) Regardless of whether counsel cited to *Remmer*, the Seventh Circuit was clearly aware of the case because it cited *Remmer* in its published opinion. *See Morales*, 655 F.3d at 630. The court found *Remmer* inapplicable because Petitioner's case involved an allegation of *internal* jury misconduct, whereas *Remmer* involved an improper *external* influence on the jury. *Id.* The Seventh Circuit thoroughly considered and ultimately affirmed the Court's handling of the jury misconduct issue. *Id.* There is no basis in the record to conclude that the result of the appeal would have been different had Petitioner's counsel cited to *Remmer*, and therefore Petitioner cannot make the requisite showing of prejudice. *See Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000) (to prevail on claim

of ineffective assistance of appellate counsel, petitioner must show that if counsel had made the argument, there is "a reasonable probability that his case would have been remanded for a new trial" or "otherwise modified on appeal"). Therefore, the Court finds no merit to this third proposed claim. For these reasons, Petitioner's motion to supplement will be denied.

## III.    Certificate of Appealability

Finally, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must decide whether to issue or deny Petitioner a certificate of appealability. To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). As is fully explained above, Petitioner's claims lack merit. Nothing before the Court suggests that jurists of reason would debate the outcome of the Petition or find a reason to encourage Petitioner to proceed further. Accordingly, the Court declines to issue him a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Petition (R. 1) is DENIED, and Petitioner is DENIED a certificate of appealability. Petitioner's motions to amend the Petition (R. 19, 20) are DENIED.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: February 23, 2015**